UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
JOSEPH CESTARO,

              Plaintiff,

     -v-

MICHAEL PROHASKA AND
CONSTRUCTION BUILDING
LABORERS LOCAL 79,

              Defendants.
```

22-cv-9444 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.:

This is a defamation action brought by Joseph Cestaro, the Recording Secretary of Construction and General Building Laborers Local 79 ("Local") against the union's Business Secretary Michael Prohaska, who he claims made several defamatory statements about him at a union meeting. See generally, First Amended Complaint ("FAC"), Dkt. 24. Specifically, Cestaro alleges that Prohaska falsely told union members at a membership meeting that Cestaro ignored approximately 1,500 voicemails left him by union members.

Cestaro originally sued in state court, raising claims for defamation and defamation per se, as well as various other tort and employment related claims. Defendants removed the case to federal court, arguing that several of Cestaro's claims were completely preempted by and therefore arose under the federal Labor Management Relations Act ("LMRA"). The Court agreed and denied Cestaro's motion to remand. See Order dated 12/22/22, Dkt. 21. It

1

then dismissed Cestaro's claims for fraud, negligent misrepresentation, prima facie tort, and several contract and employment-related claims, either because they were preempted by federal labor law or for failure to state a claim. See Memorandum Order, Dkt. 28. However, the Court allowed Cestaro's claims for defamation and defamation per se to proceed past the pleadings.

Now, Prohaska moves for summary judgment as to these two remaining claims, arguing that the undisputed facts show his statements about Cestaro's unanswered voicemails were substantially true and that, at the very least, Prohaska did not act with "actual malice." Prohaska also raises arguments under New York's common interest privilege as well as relating to Cestaro's putative failure to introduce evidence of damages. See Def. Mem. Supp. SJ ("Def. Mem."), Dkt. 31.

The Court concludes both that there can be no genuine dispute of fact that Prohaska's allegedly defamatory statements were substantially true and that Prohaska did not act with "actual malice," meaning with knowledge of or reckless disregard as to his statements' falsity. Accordingly, for reasons explained further below, the Court grants defendants' motion in full.

## I.   Legal Standard

Fed. R. Civ. P. Rule 56 allows courts to grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

2

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To succeed, the moving party must demonstrate "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the opposing party must produce "specific facts showing that there is a genuine issue for trial," by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 325.

In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Still, the court must consider whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and grant summary judgment where the nonmovant's evidence is inadequate. Id. at 249-50. The nonmovant's evidence "may not rest upon mere conclusory allegations or denials," Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir.1997), and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A conclusory contradiction of undisputed evidence

in a self-serving affidavit, unsupported by other evidence, is not
by itself sufficient to create a genuine dispute of material fact.
Zurich Am. Life Ins. Co. v. Nagel, 590 F. Supp. 3d 702, 714
(S.D.N.Y. 2022); see BellSouth Telecommunications, Inc. v. W.R.
Grace & Company-Conn, 77 F.3d 603, 615 (2d Cir. 1996) ("An adverse
party may not rest upon mere conclusory allegations or denials. .
. . It is not sufficient merely to assert a conclusion without
supplying supporting arguments or facts."). At the same time,
courts may not disregard non-conclusory statements in an affidavit
just because they are "self-serving." Danzer v. Norden Sys, Inc.,
151 F.3d 50, 57 (2d Cir. 1998).

## II.  **Factual Background**

Cestaro was formerly employed by Local 79 as its business
agent and also served as its elected Recording Secretary. Pl.
Counterstatement of Material Facts ("Pl. Counterstatement") ¶¶ 1-
6, Dkt. 44. One of his roles as business agent was to field and
respond to union member phone calls. Id. ¶ 7.

Prohaska was elected as Local 79's business manager in 2012
and has served in that role since. Id. Cestaro chose to challenge
Prohaska for the Business Manager position in late 2020. Id. ¶ 56.

In February 2021, Prohaska first suspended and fired Cestaro
from his paid job as an in-house business agent with the Local
(distinct from his elected role as Recording Secretary). Id. ¶ 30.
The reasons for the firing are hotly disputed; Cestaro contends

4

this was retaliation for his decision to challenge Prohaska in an upcoming union election, id. ¶ 61, while Prohaska contends that he became aware around December 2020 "of complaints that calls to the Local were not being returned," investigated those complaints and realized they were true, and fired Cestaro for failing to listen and respond to these voicemails, id. ¶ 13-30. Either way, why Prohaska fired Cestaro is not material to Cestaro's defamation claims.

What is material to these claims is that some weeks after Cestaro was fired, during a March 17, 2021 meeting of union membership, Prohaska told union members that Cestaro had been fired and that he had not listened to large numbers of voicemails. Id. ¶ 42. Specifically, Prohaska made the following statements:

- "On February 9th, Joe Cestaro was suspended from his position as the in-house business agent pending the investigation of an usually large volume of complaints regarding unanswered and unreturned phone calls."
- "When we looked into it, our investigation showed as of February 3rd, there were 441 messages on Cestaro's phone, 423 of them had never been opened. That's 96% of the messages in his system, on his phone system, were not opened."
- "When the phone fills up, the [messages] roll over to the computer."
- "On the computer, there were an additional 1,170 messages, 995 of them were never opened. That's 85%."
- "When you total them up, that's a total of over 90% of the messages on the in house business agent's phone, Joe Cestaro's phone, that were never even looked at."
- "This was the during the Covid-19 pandemic, a time when members needed their Local the most."
- "So, in order to be certain of these facts, I asked the district council to have their tech, their technician, verify what ours had uncovered, and he confirmed what our tech had found."

- "So subsequently, on February 22nd, Joe Cestaro was terminated for not doing his job."
- "We are currently in the process of calling every last member whose calls for help went unanswered."
- "This Local has always prided itself on its reputation of returning messages, and this board has zero tolerance, zero tolerance, for anyone who abuses their privilege of representing this membership. I want to be clear. Cestaro retains his elected position as recording secretary. You, the members, will get to decide what happens to elected positions."
- "As you know, it has been a long practice of the Local to have a single person read the membership all the recently approved executive board minutes. This month, for the first time in the history of the Local, the recording secretary has refused to read a complete set of approved minutes. As a result, the executive board has designated me to read them. So following my report, I will read the minutes on a video that was recorded yesterday."

Id. ¶ 73.

It is undisputed that Prohaska said these things. Cestaro argues that there is a genuine dispute, however, as to whether these statements were true, and whether Prohaska acted with actual malice.

### III. **Analysis**

A. <u>Requirements to show defamation</u>

To prove defamation under New York law, a plaintiff must show that a false and defamatory statement about the plaintiff was published by the defendant to a third party resulting in injury to the plaintiff. See, e.g., <u>Weldy v. Piedmont Airlines, Inc.</u>, 985 F.2d 57, 61-62 (2d Cir.1993). Where a plaintiff is a public figure, the plaintiff must also show that the defendant acted with actual malice. See <u>Curtis Publishing Co. v. Butts</u>, 388 U.S. 130, 155

(1967). Actual malice in the relevant sense does not depend on the speaker's ill will toward the speech's subject, but rather requires "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." Id. at 134. In order to demonstrate falsity, a plaintiff must show that an allegedly defamatory statement was not "substantially true," meaning that "the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." Tannerite Sports v. NBC, 864 F.3d 236, 242-42 (2d Cir. 2017).

The parties agree -- or, at the very least, Prohaska argues and Cestaro does not dispute -- that the actual malice standard applicable to public figures applies here. Def. Mem. at 13-15; Pl. Mem. Opp. SJ ("Pl. Opp.") at 15, Dkt. 44. At oral argument, Cestaro's counsel once again made no argument that any standard other than the actual malice standard applies, and the Court applies it here.[1]

_____

[1] Though Cestaro has plainly waived any argument that anything other than the actual malice standard applies, the Court believes independently that the actual malice standard is applicable. This is primarily because  federal labor law gives union members the right to "to express any views, arguments, or opinions," and "to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." 29 U.S.C. § 411(a)(2). And the Supreme Court has interpreted statutes such as this, protecting speech in labor disputes and in the context of union representation election campaigns or during union organizing efforts, as importing NY Times v. Sullivan's actual malice standard. See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 279 (1974); Linn v. United Plant Guard Workers of

Actual malice is a demanding standard, which requires Cestaro to show not simply that Prohaska acted with ill will or common law malice, but rather that he knew or recklessly disregarded the falsity of his statements. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 666 (1989) (citations and footnote omitted); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).

B. Prohaska's statements were substantially true

In Cestaro's complaint, Cestaro predicated his defamation claim on Prohaska's telling union members during a March 17, 2021 meeting that "Cestaro was derelict in his duties as In-House Business Agent and specifically that Mr. Cestaro had failed to listen to and to respond to 1,500 voicemails that Local 79 members had left for him," and that "Cestaro had failed to listen and to respond to 96% of the voicemail messages that Local 79 members had

---

Amer., Local 114, 383 U.S. 53 (1966). Further, given the publicly disputed union election, Cestaro in putting himself up for election effectively turned himself into a public figure. See, e.g., Dunlop-McCullen v. Rogers, No. 00 CIV.3274, 2002 WL 1205029, at *8 (S.D.N.Y. Feb. 21, 2002) ("Courts have generally held union members to be public figures for purposes of union business where their position is one of prominence or where their activities place them in a controversy that invites scrutiny."). See also Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) ("Whether a plaintiff is a public figure is a question of law for the court.").

left for him, which is why he was terminated from his position as In-House Business Agent." FAC ¶¶ 73-74.

As discussed above, Cestaro now points to a slightly broader set of supposedly false statements, based on the video of what Prohaska actually said, Pl. Counterstatement ¶ 73, but the allegedly defamatory aspect of these statements echoes the allegations in his complaint: that Prohaska accused Cestaro of not listening and responding to very large numbers of voicemails left him by union members. And, as to that basic accusation, the Court concludes based on undisputed evidence that it is substantially true.

Specifically, undisputed evidence shows that "when a telephone caller leaves a voicemail message on one of the Local's telephone extensions, the Local's computer system generates an email to the recipient of the message, with an audio copy of the voicemail attached." Pl. Counterstatement ¶ 9. These emails with voicemails appear, as do emails in many systems, in bold face until they are read, while the bold face disappears once they have been read. Id. ¶ 17. Voicemails are also stored through the regular telephone system, which allows a recipient to call in to access them. Malyszko Decl. ¶ 8, Dkt. 34.

After Prohaska looked into whether Cestaro in fact had a large number of unanswered voicemails -- according to Prohaska, because he became aware of complaints involving Cestaro's failure to answer

such voicemails, and, according to Cestaro, because Prohaska was looking for dirt on Cestaro in advance of the union election -- Prohaska tasked a union IT specialist with looking into whether there were any issues with the phone system and whether Cestaro had received and listened to union members' voicemails. Id. ¶¶ 8-27.

This investigation uncovered that there was no technical problem with the phone system, a fact Cestaro does not dispute. Id. ¶¶ 15-16. It further uncovered that there were several hundred apparently "unread" voicemail email messages in Cestaro's email inbox, and, further, that there were almost 1,000 apparently "unread" voicemail email messages that were in Cestaro's deleted emails. Id. ¶¶ 23-24. Additionally, the IT specialist analyzed whether Cestaro had called in to access the voicemails through the regular phone system and found he had not. Id. ¶¶ 17-18; Malyszko Decl. ¶ 12 ("I also checked to see whether Cestaro had ever listened to his voicemail messages by calling the Local's telephone system. I found that Cestaro had never done so. I knew this because the system indicated that no one had ever accessed extension 7988 (Cestaro's extension) using the required 4-digit PIN.")

In a declaration, Cestaro "categorically den[ies] that there is any truth to the statement made about me regarding unreturned phone calls." Cestaro Decl. ¶ 14. But when he gets into specifics, the wording of Cestaro's declaration becomes much more ambiguous.

For instance, after "categorically" denying Prohaska's statements, Cestaro stated: "Nothing could be further from the truth. First, I made every effort to return member phone calls." Id. ¶¶ 15-16 (emphasis added). Cestaro also states that, during the pandemic, he was "actually taking many more calls than usual," including "direct calls from the members." Id. ¶ 18.[2] None of these statements explicitly address the apparently unread emails appearing in Cestaro's email inbox and deleted folder, or state that he called in to check voicemails as an alternative to listening to the email copies.

Cestaro gave similarly evasive testimony in his deposition. For instance, what should have been a simple question about whether Cestaro in fact listened to emails containing voicemails whenever they came in produced the following exchange:

> Q. Did you listen to all of the voicemails you received? · And again, I'm talking in the 2021 timeframe?
>
> A. The 2021. To the best of my ability, yes, -- -- to the best of my knowledge, I did what I had to do, and I answered the calls.
>
> Q. Okay. Let me just be precise. I'm asking you, did you click open every e-mail you received notifying you that you had received a voicemail?
>
> MR. BRICK: · Objection to the form.

---

[2] It is unclear whether by referring to "direct calls," Cestaro means he fielded calls on a different phone number, such as a cell phone number, from the union number that was the subject of Prohaska's statements.

A. I clicked on -- say that again, because I'm trying to figure out what you're -- what you're --  saying.

Q. Yeah, no problem. You explained earlier that when you received a voicemail on your extension at the Local, you would receive in your work e-mail an e-mail notifying you that you had received a voicemail?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. Okay. Did you -- every time you got one of those e-mails, did you open it?

A. I opened to the best of what I could open. I opened -- from what I -- what I -- believe that -- what had to be opened.

3/9/23 Tr. 77:25-79:1 (Cestaro), Dkt. 32-1.

What stands out from both Cestaro's declaration and his deposition testimony is that, notwithstanding his supposedly "categorical" denial of Prohaska's statements, Cestaro nowhere states he listened to all voicemails he received, whether through the emails he received or some other way. Instead, he states that he opened "what had to be opened" or that he "made every effort" to listen to voicemails. He does not state that he actually did listen to the voicemails in question. Accordingly, Cestaro's conclusory "denial" of Prohaska's statements writ large does not raise any genuine dispute of material fact as to the allegedly defamatory aspect of those statements: that Cestaro did not open and listen to hundreds of voicemails left him by union members.

Cestaro next points to deposition testimony from the union IT specialist who looked into Cestaro's voicemails indicating that -- just as in many email systems -- a message can be toggled between "read" and "unread" status repeatedly; apparently, the system's metadata does not record whether an email has in fact been toggled back and forth from "unread" to "read" and then back to "unread." Pl. Counterstatement ¶ 17; 4/26/23 Tr. 31:22-2-8, 33:5-17 (Malyszko). But Cestaro points to no evidence that this mere technological possibility of toggling back and forth ever happened. If Cestaro listened to the voicemails, leading to them to appear as "unread," and subsequently toggled them back to "unread status, he could easily have said so, but he did not; as noted above, he did not even say he listened to them in the first place. See generally Cestaro Decl. Nor does Cestaro raise any evidence that anyone else toggled the emails back and forth.[3] To survive summary judgment, a party must demonstrate a "genuine" dispute of material fact, not mere "metaphysical doubt." Matsushita, 475 U.S. at 586. The mere possibility that messages could be toggled without any evidence that they were toggled is insufficient.

---

[3] Cestaro never directly suggests that Prohaska somehow arranged for Cestaro's apparently unread voicemails to appear unread in order to frame him, presumably because there is zero evidence to support such an extravagant theory.

13

Cestaro also notes that when Prohaska tasked a different union official, Jasmine Perdomo, with following up on the apparently unread voicemails by calling the callers back, she ultimately stopped calling all the callers back; Cestaro suggests this is because Prohaska knew the callers' complaints had actually been addressed, or at least that Prohaska wasn't interested in learning whether or not they had been. Pl. Opp. 17. Defendants respond that as Perdomo began calling back union members whose voicemails had been left months previously, many members could no longer remember why they called or had already had their complaints somehow addressed. Defs. Reply Supp. SJ ("Defs. Reply") at 7-8. Either way, what Ms. Perdomo's notes of her calls demonstrate is that as to 123 union members she called, the calls of many union members had never been returned. See generally Perdomo Notes, Dkt. 42-1. As to many members, the notes demonstrate that Cestaro did not return their calls. Id. at 3, Note 6 ("He was never called back"); id. Note 7 ("No one got back to them"). The notes of some calls indicate that some members ultimately got through to someone, often after repeated calls, although often not Cestaro. Id. Note 8 (a member has "been trying to get in contact with Joe for a couple weeks" and ultimately was helped by someone different named Steve). And, of the 123 members Ms. Perdomo spoke to, a handful ultimately did speak to Cestaro, sometimes without much effort but often after repeated attempts or through the assistance of others. Id. at 1,

Note 1 (reflecting that after a member "called back a couple of times" the member "got in contact with Joe's assistant who got him in contact with Joe" to make a needed appointment); id. at 1, Note 4 (reflecting that Joe "did get back to him"); id. at 4, Note 11 (reflecting that "Joe did get back to" a caller "after a few days" and multiple "messages"); id. at 8, Note 30 (reflecting that, after never receiving a call back, a caller "came to the union after a week and saw Joe in person"). In any event, nothing in Perdomo's notes -- or in the fact that she only contacted 123 union members -- gives rise to a genuine dispute of material fact as to whether Cestaro in fact did not listen to over 1,000 voicemails as Prohaska claimed.

Accordingly, the Court concludes there is no genuine dispute of material fact that, as Prohaska stated, Cestaro did not open or listen to well over 1,000 voicemails to his union phone number, while opening and listening to a much smaller number.[4] This was the statement that Cestaro alleged was defamatory in his complaint, FAC ¶¶ 81-102, and the undisputed evidence shows it was substantially true. Cestaro therefore falls back on several more

---

[4] Of course, Cestaro may still, as he claims, have fielded many members calls, Cestaro Decl. ¶ 18, such as if he was taking them directly on his cell phone. But that would not create any dispute of fact as to whether he in fact listened to over 1,000 voicemails received on his union number.

specific quarrels with Prohaska's statements that are distinct from what he alleged in his complaint.

Most significantly, Cestaro argues that Prohaska lied by, after describing the undisputedly correct number of unopened voicemails in Cestaro's email inbox and deleted messages folder, stating "[t]his was during the Covid-19 pandemic, a time when members needed their Local the most." Counterstatement ¶ 73; see id. ¶ 43; Pl. Opp. 12. This, according to Cestaro, was false or misleading because of the 1,418 total messages Prohaska stated Cestaro didn't listen to, a majority were left before the pandemic, and, indeed, the email inventory conducted by the union's IT specialist extended back several years. Pl. Opp. 12. Accordingly, Cestaro argues Prohaska effectively misled union members by painting a picture of him as having abandoned his duties during the pandemic, when, in fact, that was not the case.

This argument, too, fails to give rise to any genuine dispute of material fact, for multiple reasons. For one thing, Prohaska never said that all of Cestaro's un-listened to voicemails were left during the pandemic, although the Court agrees that a listener may have had that impression. But the real problem with Cestaro's argument is that huge numbers of the unopened voicemails were left during the pandemic -- 609 of them, in fact. See Second Malyszko Decl. ¶ 3, Dkt. 47. Nor has Cestaro introduced any evidence that

Prohaska mis-described the rate at which he opened the voicemails he received during the pandemic.

The test for substantial truth is not literal accuracy but whether "the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." Tannerite, 864 F.3d at 242-42. Prohaska told union members "there were 441 messages on Cestaro's phone, 423 of them had never been opened. That's 96% of the messages in his system, on his phone system, were not opened. . . . On the computer, there were an additional 1,170 messages, 995 of them were never opened. That's 85%. . . . When you total them up, that's a total of over 90% of the messages on the in house business agent's phone, Joe Cestaro's phone, that were never even looked at. . . . This was the during the Covid-19 pandemic, a time when members needed their Local the most." Pl. Counterstatement ¶ 73. Cestaro apparently posits that the effect of this statement on union members' minds would have been materially different if Prohaska said exactly the same words, except that, instead of saying "This was during the COVID-19 pandemic," he had said "Of the 1,418 totally unopened voicemails, 609 were left during the COVID-19 pandemic, a time when members needed their local the most." The suggestion that these statements would give rise to a materially different impression is frankly implausible, which is almost certainly why Cestaro's complaint, while it laid out in detail Prohaska's

17

allegedly defamatory statements regarding Cestaro's failure to open voicemails, never once mentioned the COVID-19 pandemic. See generally FAC. Accordingly, the Court concludes on the basis of the undisputed facts that Prohaska's statements about Cestaro's unopened voicemails were substantially true.[5]

Cestaro notes a few technical inaccuracies by Prohaska; for instance, Prohaska's statement that "When the phone fills up, the [messages] roll over to the computer," was technically false, as instead what happens is that voicemails were simultaneously recorded both through the phone and email system, and the two locations Prohaska was describing were not Cestaro's phone and email inbox, but rather his email inbox and his deleted messages folder. But no reasonable factfinder could conclude that this apparent misunderstanding by Prohaska as to how the technical system worked affected the substantial truth of his statements

---

[5] Further, even if one could imagine that a reasonable fact finder might have found that Prohaska's statements about the timing of the unopened voicemails were false, there is no evidence that Prohaska stated them with knowledge or awareness of their falsity. A viewer looking at Cestaro's inbox or deleted messages folder replete with unopened voicemails would see the first page of unopened messages all dating from the COVID-19 pandemic, as well as several pages after that. See Malyszko Decl. Exs. A, B, C. And it is undisputed that Prohaska got his numbers that he passed onto union membership by looking at just such a computer screen. Pl. Counterstatement ¶ 25. There is therefore no evidence that Prohaska knowingly lied or consciously disregarded the possibility that he was lying when he made the statement about the COVID-19 pandemic, meaning there is no dispute of material fact as to whether he acted with actual malice.

that Cestaro had not in fact listened to two very specific (and correct) numbers of unopened voicemails in two separate locations. See Prohaska Second Decl., Dkt 46.

Finally, Cestaro argues that Prohaska defamed him by stating that "for the first time in the history of the Local, the recording secretary has refused to read a complete set of approved minutes. As a result, the executive board has designated me to read them. So following my report, I will read the minutes on a video that was recorded yesterday." Pl. Counterstatement ¶ 73; Pl. Opp. 13. In fact, Cestaro argues that he refused to read minutes because they contained statements about his failure to listen to voicemails, which he considered to be defamatory. Pl. Opp. 13.

Once again, this theory of defamation was totally absent from Cestaro's complaint. See generally FAC. And once again, this exclusion likely reflects the fact that any allegedly defamatory aspect of Prohaska's statement that Cestaro failed to read the meeting minutes is far downstream of the central issue: whether or not it was true that Cestaro failed to listen to voicemails. Further, there is in fact no dispute that Cestaro did refuse to read the minutes adopted by the union's board, even if Cestaro believed he was justified in so refusing. Pl. Counterstatement ¶ 88. Accordingly, the Court once again concludes that the undisputed evidence shows Prohaska's statement was substantially true.

For the foregoing reasons, the Court concludes on the basis of the undisputed evidence that Prohaska's allegedly defamatory statements were substantially true, which means that Cestaro has failed to make out an essential element of his defamation and defamation per se claims. Tannerite, 864 F.3d at 242-42. Accordingly, the Court grants defendants' motion for summary judgment on this basis. Further, the Court holds that even assuming arguendo (and contrary to the Court's own conclusions) that a genuine dispute of material fact existed as to some aspect of Prohaska's allegedly defamatory statements, there is no evidence that Prohaska spoke with knowledge of or reckless disregard as to any putative falsity. Accordingly, Cestaro has failed to adduce any genuine dispute of fact as to whether Prohaska acted with "actual malice," Sullivan, 376 U.S. at 279-80, the standard both side agree applies.[6] Without reaching defendants' arguments about damages or New York's common interest privilege, the Court therefore concludes that defendants are entitled to summary judgment on Cestaro's remaining claims.

## IV.  Conclusion

For the foregoing reason, the Court grants defendants' motion for summary judgment in its entirety and dismisses Cestaro's

---

[6] The Court expresses no opinion as to whether Prohaska was motivated by malice as the word is more colloquially understood: animus toward Cestaro.

complaint with prejudice. The Clerk is directed to enter final judgment in defendants' favor.

      SO ORDERED.

New York, NY
July 7, 2022

                                    JED S. RAKOFF, U.S.D.J.